Court of Appeals Case No. 15-55500

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PERFECT 10, INC.,

*Plaintiff-Appellant,*

v.

GIGANEWS, INC. AND LIVEWIRE SERVICES, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
Dist. Ct. No. 2:11-cv-07098-AB-SH

## BRIEF FOR *AMICUS CURIAE* RECORDING INDUSTRY
## ASSOCIATION OF AMERICA, INC. URGING REVERSAL

GEORGE M. BORKOWSKI
RECORDING INDUSTRY ASSOCIATION
 OF AMERICA, INC.
1025 F Street, N.W.
Washington, DC 20005
(202) 775-0101

THOMAS G. HENTOFF
NICHOLAS G. GAMSE
WILLIAMS & CONNOLLY LLP
 725 Twelfth Street, N.W.
 Washington, DC 20005
 (202) 434-5000

*Counsel for Amicus Curiae Recording
Industry Association of America, Inc.*

## **<u>CORPORATE DISCLOSURE STATEMENT</u>**

Pursuant to Federal Rule of Appellate Procedure 26.1, to enable judges and magistrates of the Court to evaluate possible disqualification or recusal, the undersigned attorney of record for *amicus curiae* certifies that the Recording Industry Association of America, Inc. has no parent corporation, and no publicly held company holds more than 10% of its stock.

Dated: December 23, 2015

/s/ Thomas G. Hentoff
Thomas G. Hentoff

## **TABLE OF CONTENTS**

INTEREST OF *AMICUS CURIAE* ....................................................1

SUMMARY OF ARGUMENT ..........................................................2

ARGUMENT ......................................................................8

I.   Case Law from the 1990s Discussing the Usenet Network Should Not Immunize Defendants' Different and Modern Piracy Service.........8

II.  The District Court Misstated the Test for Direct Copyright Infringement .............................................................11

    A.   This Court Should Reject a "Volitional Conduct" Test for Direct Infringement..........................................12

    B.   Automation Does Not Negate a Defendant's Direct Infringement........................................................17

    C.   A "Volition" Test Could Not Logically Be Applied to Infringement of the Distribution Right............................20

III. The District Court Misstated the Test for Intentional Inducement of Copyright Infringement......................................22

IV.  The District Court Misapplied the Test for Contributory Copyright Infringement by Material Contribution ................................26

V.   The District Court Misconstrued the Financial-Benefit Element of the Test for Vicarious Copyright Infringement ....................29

CONCLUSION....................................................................34

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT AND TYPE STYLE REQUIREMENTS..........................................36

CERTIFICATE OF SERVICE........................................................37

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ....................................................................... 7, 23, 26, 27, 29, 32, 33

*American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014) .......................................................................... 4, 16, 17, 18

*Arista Records LLC v. Myxer Inc.*, 2011 WL 11660773 (C.D. Cal. Apr. 1, 2011) ............................................................................ 14

*Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409 (S.D.N.Y. 2009) ................................................................... 8, 9, 10

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009) ...................................................................... passim

*BMI v. Blumonday, Inc.*, 1994 WL 259253 (D. Nev. May 27, 1994) ........................................................................................ 33

*Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013) ................................................................................ 19

*Cartoon Network LP, LLLP v. CSC Holdings, Inc*, 536 F.3d 121 (2d Cir. 2008) .................................................................... 13, 15, 20

*Columbia Pictures Indus., Inc. v. Fung*, 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) ........................................................................ 23, 24

*Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ....................................................................... 6, 23, 24, 25, 26

*CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) ................ 13

*Diversey v. Schmidly*, 738 F.3d 1196 (10th Cir. 2013)...................................... 21

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) .............................. 28, 30, 33

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ......................12

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) ................................................................................30, 33

*Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060 (9th Cir. 2014) ................................................................................12, 16

*Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068 (9th Cir. 2013) ................................................................................28, 29

*MGM Studios Inc. v. Grokster, Ltd.*, 380 F.3d 1154 (9th Cir. 2004) ................................................................................25

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ......6, 7, 23, 24, 25, 29

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ................................................18, 19, 23, 26, 27, 28

*Perfect 10, Inc. v. Giganews, Inc.*, 2013 WL 2109963 (C.D. Cal. Mar. 8, 2013) ................................................................4, 12, 17

*Perfect 10, Inc. v. Giganews, Inc.*, 2013 WL 3610706 (C.D. Cal. July 10, 2013) ................................................................4, 12, 20

*Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 8628031 (C.D. Cal. Nov. 14, 2014) ................................................................passim

*Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 8628034 (C.D. Cal. Nov. 14, 2014) ................................................................passim

*Perfect 10, Inc. v. Giganews, Inc.*, 2015 WL 1746484 (C.D. Cal. Mar. 24, 2015) ................................................................2

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007) ................................................................24, 25, 29

*Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543 (N.D. Tex. 1997) ................................................................19

*Polygram Int'l Publ'g., Inc. v. Nevada/TIG, Inc.*, 855 F. Supp. 1314 (D. Mass. 1994) ................................................................31, 32

iv

*Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, 338 F. App'x 329 (4th Cir. 2009) ................................................................14, 19

*Religious Technology Center v. Netcom On-Line Commc'n Sers., Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ............................................3, 8, 9, 12

*Reno v. ACLU*, 521 U.S. 844 (1997) .......................................................8

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) ........................................................................................................31

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012) ...............................................................14, 15

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. 2011) ..........................................................................14

## STATUTES

17 U.S.C. § 106 ...............................................................................5, 20, 22

17 U.S.C. § 506 ..........................................................................................21

17 U.S.C. § 512 ..............................................................................6, 27, 28

## OTHER AUTHORITIES

2 Paul Goldstein, *Goldstein on Copyright* (3d ed. Supp. 2014) ..................15, 19

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2015) ..........................................................................................passim

Paul Craig, *Software Piracy Exposed* (2005) .........................................9

## INTEREST OF *AMICUS CURIAE*

With the consent of all parties, *amicus curiae* Recording Industry Association of America, Inc. ("RIAA") respectfully submits this brief urging reversal of the district court rulings addressed herein.[1]

The RIAA is the trade organization that supports and promotes the creative and financial vitality of the major recorded music companies. Its members are the music labels that comprise the most vibrant record industry in the world. RIAA members create, manufacture, and/or distribute approximately 85% of all legitimate recorded music produced and sold in the United States.

The RIAA's members create and make available to the American public a vast number and variety of copyrighted sound recordings. The business of the defendants-appellees ("defendants") is built on unlawfully exploiting the works of RIAA members and others, by engaging in and facilitating for profit the unauthorized copying and distribution of these works on a massive scale. The RIAA's members are harmed by the type of

---

[1] Counsel for the parties have not authored this brief in whole or in part. No one other than *amicus* and its members contributed money that was intended to fund preparing or submitting this brief.

large-scale Internet piracy at issue in this case, which the district court in the decisions under review erroneously held did not constitute copyright infringement. The RIAA and its members therefore have a significant interest in the important questions that this case presents concerning the liability of Internet businesses that illicitly profit from the copying and distribution of pirated works.

## SUMMARY OF ARGUMENT

The district court believed that the rulings now under review "helped demarcate the boundaries of copyright law." *Perfect 10, Inc. v. Giganews, Inc.*, 2015 WL 1746484, at *7 (C.D. Cal. Mar. 24, 2015) (Birotte, J.) (quotation omitted). On a number of important issues regarding liability for direct and secondary copyright infringement, the district court indeed staked out new law in a sense – by disregarding and misapplying existing law, including controlling Supreme Court and Ninth Circuit precedent. In doing so, the district court provided legal immunity to a business that profits from mass piracy by selling access to unauthorized copies of copyrighted works that it chooses to copy, store, and make available on its servers. This is the very same type of business that the Southern District of New York in an earlier case held liable for direct, contributory, and vicarious infringement, and

intentional inducement of infringement. *See Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 159 (S.D.N.Y. 2009) ("*Arista II*"). The district court's analysis of important copyright law questions was wrong in at least the following ways:

1. The district court erred in holding that concerns for protecting the operation of the open Internet that animated early decisions involving Usenet, like *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*"), also protect defendants' starkly different private, fee-based business that actively promotes piracy. Defendants program their servers to reproduce massive quantities of unauthorized copies of copyrighted music, movies, software, and images, which they take from other servers known to host pirated content. Defendants then distribute those infringing copies to users for the specific purpose of profiting from copyright infringement, charging a fee that increases based on how much content each user wants to download, up to $35 a month.

To accomplish their aims, defendants utilize the Usenet network, a network of interconnected servers that predates the World Wide Web. But defendants' conduct does not resemble in any relevant way the conduct of the

3

Usenet service providers in 1990s cases that involved facilitation of access to comments on Internet bulletin boards.

2.      In rulings entered on motions to dismiss, *Perfect 10, Inc. v. Giganews, Inc.*, 2013 WL 2109963, at *5-9 (C.D. Cal. Mar. 8, 2013) (Matz, J.); *Perfect 10, Inc. v. Giganews, Inc.*, 2013 WL 3610706, at *3 (C.D. Cal. July 10, 2013) (Collins, J.), and at summary judgment, *Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 8628034, at *6-7 (C.D. Cal. Nov. 14, 2014) (Birotte, J.), the district court misstated and misapplied the law of direct infringement in three important and related respects.

First, addressing an open question in this Circuit, the district court endorsed the controversial "volitional conduct" requirement for direct infringement. While such a test has been articulated by courts including panels of the Second and Fourth Circuit Courts of Appeals, it has been widely criticized and questioned by other courts and commentators, including district courts in this Circuit. In addition, the Supreme Court declined to adopt a volitional conduct requirement for direct infringement only a year ago in *American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498, 2507 (2014). This Court should do the same.

4

Second, the district court rejected defendants' liability for direct infringement on the ground that defendants had automated their infringement, based on the court's erroneous belief that the volitional conduct test requires such a result. It is not and has never been the law that a defendant that uses software that causes unauthorized copies to be made is any less liable for direct infringement than a defendant that does the same thing manually.

Third, even if one accepted *arguendo* the contention that a volitional conduct requirement existed for direct infringement of the reproduction right, 17 U.S.C. § 106(1), no such requirement could exist for infringement of the distribution right, 17 U.S.C. § 106(3). The distribution right covers conduct – such as making works available for distribution by sale, rental, or lending, *see id.* – that inherently requires no "volitional" act by a distributing defendant.

3.     The district court misstated the test for intentional inducement of copyright infringement by confusing it with the test for contributory infringement by material contribution. A defendant is liable for intentional inducement when it (1) provides a device, product, or service; (2) with the object or intent of promoting its use to infringe copyright; and (3) the device,

5

product, or service causes (4) acts of infringement by another. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032, 1033 (9th Cir. 2013). The Supreme Court and this Court have both made clear that actual knowledge of specific infringements caused by a defendant's inducement is <u>not</u> an element of the intentional inducement test. *See MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 931, 934 (2005); *Fung*, 710 F.3d at 1037-38. Nevertheless, the district court granted summary judgment for defendants on the sole basis that "there is no evidence that Giganews had any actual knowledge of any specific infringing materials that it did not immediately block access to." *Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 8628031, at *11 (C.D. Cal. Nov. 14, 2014) (Birotte, J.). This was clear legal error.

4. The district court also misapplied the law governing the knowledge element of contributory infringement by material contribution. Defendants' summary judgment motion did not raise a Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. § 512, safe harbor defense. The district court nevertheless invoked a facially inapplicable DMCA safe harbor provision, *id.* § 512(c)(3)(B)(i), to reject key evidence of defendants' actual knowledge of specific infringement, *see Giganews*, 2014 WL 8628031, at *8-9. This too was clear legal error.

6

5.     Finally, the district court misstated the law of vicarious infringement liability.  A defendant infringes vicariously by (1) receiving a financial benefit from others' direct infringement while (2) declining to exercise a right or ability to stop or limit the infringement.  *See Grokster*, 545 U.S. at 930.  A plaintiff can satisfy the financial benefit element by showing that "the availability of infringing material acts as a draw for customers." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001) (quotation omitted).

Citing no legal authority, the district court added an extra element to the vicarious liability test.  The court held that a plaintiff also must prove that its own works, or its category of works, acted as a specific draw to defendants' service.  *See Giganews*, 2014 WL 8628031, at *3-4.  This ruling is contrary to decades of vicarious infringement jurisprudence, which rests defendants' liability on their profiting from general infringing activity that they have the ability to supervise or control.  Affirming such a ruling would upend the policy behind vicarious liability, shielding companies able to supervise or control infringement on their service when the infringing activity from which they profit is <u>so</u> extensive that it makes the infringement of the works of smaller plaintiffs difficult to measure.

7

## **ARGUMENT**

## I.    Case Law from the 1990s Discussing the Usenet Network Should Not Immunize Defendants' Different and Modern Piracy Service

The district court relied on factually outdated case law concerning the Usenet network of the 1990s to reach the erroneous conclusion that a finding of direct liability in this case could threaten "'countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet.'" *Giganews*, 2014 WL 8628034, at *7 (quoting *Netcom*, 907 F. Supp. at 1372).

The Usenet network described in 1990s case law was generally free to use for those with an Internet connection. For instance, none of the defendants in *Netcom* charged a fee for access to servers connected to the Usenet network. *See* 907 F. Supp. at 1365-66. "Usenet was originally created to distribute text content only," *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 415 (S.D.N.Y. 2009) ("*Arista I*"), and the early Usenet cases concerned dissemination of written works such as "exchange[s] of information [and] opinion on . . .topic[s] running the gamut from . . . the music of Wagner to Balkan politics to AIDS prevention to the Chicago Bulls," *Reno v. ACLU*, 521 U.S. 844, 851 (1997).

8

It was these service providers – who directly and indirectly supported this open Usenet – to which the *Netcom* court referred when it expressed concern about protecting "countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet." *Netcom*, 907 F. Supp. at 1372.

The conduct at issue today is entirely different. Shady companies now use the Usenet network to copy copyrighted movies, music, software, and images from servers known to host pirated content; store those works on their own servers for extended periods of time to maximize the availability of the infringing content; and then distribute those pirated copies to their users. *See, e.g.*, Paul Craig, *Software Piracy Exposed* 157 (2005).

These companies profit handsomely by charging their users monthly fees for private access to this unauthorized content – fees that increase based on the amount of content users download. *See Arista II*, 633 F. Supp. 2d at 131 (defendants, charging from $4.95 to $18.95 a month for access to the pirated content on their servers).

The "newsgroups" that are copied from server to server include those that are devoted to distributing pirated works, with names such as "alt.binaries.sounds.mp3.beachboys" and "alt.binaries.music.springsteen,"

9

and the "articles" include files that contain pirated works. *Arista I*, 608 F. Supp. 2d at 428. In *Arista II*, the U.S. District Court for the Southern District of New York granted summary judgment for plaintiffs, ruling against defendants that, like the defendants here, ran a piracy business that operated on the Usenet network. *See* 633 F. Supp. 2d at 148-49. Notably, a study conducted in that case actually sampled the content of music files from pirate newsgroups available on the servers of one of the two defendants here, Giganews.[2] The study concluded that <u>more than 94%</u> of the music files available from Giganews were either unauthorized or highly likely to have been unauthorized. *See Arista II*, 633 F. Supp. 2d at 144.

This case simply involves defendants who utilize the Usenet to profit from piracy by selling access to infringing content from private servers that they control. Unlike legitimate service providers involved in the early Usenet cases, the defendants here are committing blatant copyright infringement. Recognizing this fact does not undermine in any way the operation of the open Internet.

---

[2] After being sued, the defendants in *Arista II* destroyed evidence of newsgroups hosted on their own servers. As a substitute, plaintiffs' expert studied similar newsgroups available on the servers of Giganews. *Arista II*, 633 F. Supp. 2d at 144.

## II.   The District Court Misstated the Test for Direct Copyright Infringement

In *Arista II*, the court found the defendants to have engaged in direct copyright infringement through their comprehensive control over the copying, storage, and distribution of unauthorized content on their own computer servers as part of their for-pay Usenet service. *See* 633 F. Supp. 2d at 148-49.

The *Arista II* defendants engaged in direct copyright infringement in several ways. They programmed their servers to copy from newsgroups devoted to supplying pirated mp3 music files that were popular with defendants' users; they created servers optimized for storing and distributing such files; and they controlled the content copied by and available on their servers – activities that "transform[ed] Defendants from passive providers of a space in which infringing activities happened to occur to active participants in the process of copyright infringement." *See id.* (quotation marks omitted).

The district court improperly immunized similar conduct by the defendants here. Its analysis was undermined by a number of errors that combined to lead to this result. These included the district court (1) adopting the controversial "volitional conduct" test for direct infringement;

11

(2) misapplying that test to rule that, as a matter of law, defendants cannot be liable for direct infringement when they "program their servers to . . . download infringing content," *Giganews*, 2013 WL 2109963, at *2, *9; and (3) extending this categorical automation ruling to defendants' infringement of the distribution right, *Giganews*, 2013 WL 3610706, at *3.

## A. This Court Should Reject a "Volitional Conduct" Test for Direct Infringement

Traditionally, "[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Beginning with the widely cited 1995 *Netcom* case, courts have recognized that, as with any tort, direct infringement requires some proof of causation. *See* 907 F. Supp. at 1370. This Court has recently characterized this as "a requirement that the defendant cause the copying." *Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1067 (9th Cir. 2014).

*Netcom* observed that "[a]lthough copyright is a strict liability statute, there should still be some element of volition <u>or</u> causation." 907 F. Supp. at 1370 (emphasis added). Some courts, focusing on this language but ignoring the use of the disjunctive, have departed from accepted copyright law to

12

create a new, additional requirement for direct infringement: an ill-defined concept bearing the label "volitional conduct."[3]  These courts are most notably panels of the Fourth Circuit, which in *CoStar Group, Inc. v. LoopNet, Inc.*, stated that "a person ha[s] to engage in volitional conduct . . . to become a direct infringer," 373 F.3d 544, 551 (4th Cir. 2004), and the Second Circuit, which in *Cartoon Network LP, LLLP v. CSC Holdings, Inc*, stated that "volitional conduct is an important element of direct liability," 536 F.3d 121, 131 (2d Cir. 2008) ("*Cablevision*").

Such a requirement, however, finds no support in copyright law and draws distinctions that are at once arbitrary and open to confusion and mistake.  It is no surprise, therefore, that courts and leading commentators alike have criticized or questioned these rulings and sought to limit them to their facts.

For example, the next time the Fourth Circuit considered a defendant's assertion that volitional conduct is a required element of direct infringement, the court rejected that contention and ruled against the

---

[3] "That single reference to 'volition' has caused tremendous ferment."  4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ("Nimmer") § 13.08[C] (2015).

defendant.  *See Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, 338
F. App'x 329 (4th Cir. 2009) (unpublished).  In *Quantum Systems*, the
Fourth Circuit emphasized that the *CoStar Group* volitional conduct ruling
had been limited to the context of Internet service providers "passively
storing material at the direction of users in order to make that material
available to other users upon their request." *Id.* at 336 (quotation marks
omitted).  The court even chided the defendant for "overstat[ing] the
'volitional' requirement <u>purportedly</u> established by *CoStar*." *Id.* (emphasis
added).

Other courts, including two district courts in the Ninth Circuit, have
expressed similar skepticism. *See, e.g., Warner Bros. Entm't Inc. v. WTV
Sys., Inc.*, 824 F. Supp. 2d 1003, 1011 n.7 (C.D. Cal. 2011) ("'[I]n light of the
fact that copyright infringement is a strict liability offense, the Court is not
inclined to adopt' . . . the so-called volitional conduct requirement without
clear instruction from the Ninth Circuit.") (quoting *Arista Records LLC v.
Myxer Inc.*, 2011 WL 11660773, at *14 (C.D. Cal. Apr. 1, 2011)).  For its part,
the First Circuit in 2012 observed that the "'volitional act' position" had been
raised in other circuits with only "varying degrees of success," and elected to

refrain from recognizing such a requirement. *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012).

Leading copyright scholars also have questioned or disputed the existence of a volitional conduct requirement. The Nimmer treatise, for instance, notes its "respectful[] [disagreement]" with the Second Circuit's "treatment of volitional conduct," 4 Nimmer, *supra* p. 17, § 13.08[C], and Professor Paul Goldstein emphasizes that "American copyright law has never required that liability for direct infringement be imposed only on the individual who presses the 'record' button," 2 Paul Goldstein, *Goldstein on Copyright* ("Goldstein") § 7.0.2, at 7:8.1 (3d ed. Supp. 2014).

And the Second Circuit itself in *Cablevision* imposed significant limitations on its "volitional conduct" ruling, including that "[w]e need not decide today whether one's contribution to the creation of an infringing copy may be so great that it warrants holding that party directly liable for the infringement, even though another party" has acted "volitionally" to make the copy. *Cablevision*, 536 F.3d at 131, 133.[4]

---

[4] The "volitional conduct" test is also hopelessly ill defined: The district court here applied the test to find no direct infringement, reasoning that the defendants had not "<u>actively</u> caused the infringement." 2014 WL 8628034, at *8 (emphasis in original). Yet the *Arista II* court, following *Cablevision* as

Finally, last year, when the Supreme Court was expressly asked to recognize a "volitional conduct" requirement in the context of the 17 U.S.C. § 106(4) public performance right, it declined to do so. In *Aereo*, the Court held that the defendant was directly liable for causing infringement of plaintiffs' public performance right by providing equipment and software that retransmitted broadcast television signals over the Internet to the defendants' subscribers. *See* 134 S. Ct. at 2507. The dissent urged the adoption of a "volitional conduct" requirement and – following the reasoning of *Cablevision* – a holding that the defendant was not liable for direct infringement because its transmissions were sent by an automated system in response to users' volitional requests. *See id.* at 2512-14, 2516 (Scalia, J., dissenting).[5] But the Court rejected both requests. It held that the

---

Second Circuit precedent, applied the test to find the defendants there liable for direct infringement based on substantially similar conduct, reasoning that they "actively engaged in the process" of copyright infringement. 633 F. Supp. 2d at 149.

[5] The dissent identified this Court's decision in *Fox Broadcasting* as adopting a volitional conduct requirement, *id.* at 2512, but we respectfully submit that the dissent was mistaken. This Court in *Fox Broadcasting* emphasized that its review of a district court preliminary injunction ruling was for abuse of discretion only, 747 F.3d at 1067, and the opinion did not even mention the terms "volitional conduct" or "volition." The Nimmer treatise thus concluded that *Fox Broadcasting* made no "circuit court

defendant was directly liable for publicly performing the plaintiffs'
copyrighted works and explained that evidence that the defendant's system
transmitted requested programs "[o]nly . . . in automatic response to the
subscriber's request" was "not critical" when establishing liability for direct
infringement. *Id.* at 2507 (majority opinion); *see also* 4 Nimmer, *supra*,
§ 13.08 (explaining that *Aereo* "calls into question the discussion of volition in
other past cases exonerating suppliers of equipment and services based on
absence of volition").

This Court should likewise decline to adopt an unnecessary and
problematic "volitional conduct" requirement for direct infringement.

### B.    Automation Does Not Negate a Defendant's Direct Infringement

The district court also erred by holding that, because the defendants
here had automated much of their conduct, they could not be liable for direct
infringement. *See Giganews*, 2014 WL 8628034, at *1, *9, & n.15; *Giganews*,
2013 WL 2109963, at *5-9.  In doing so, the district court rejected key
evidence of the defendants' direct copyright infringement.  This included
evidence that defendants had targeted for copying and distribution

_____

pronouncement mandating the element of volition."  4 Nimmer, *supra*,
§ 13.08.

newsgroups and servers known to feature pirated content, programming

their servers to copy such content and store it long enough to make

defendants' service a preferred destination for users looking for pirated

music, movies, software, and images. *See* Dkt. No. 508-2, Ex. 16 at 1

(newsgroup titles including "alt.binaries.music.beatles,"

"alt.binaries.music.springsteen," and "alt.binaries.playboy").

That such conduct – deliberately designed and instigated by the

defendants – arguably results in "a completely automated process" for

infringement, 2014 WL 8628034, at *9 n.15, is no reason to shield defendants

from liability for direct infringement.

As discussed above, the Supreme Court in *Aereo* specifically rejected

the contention that a defendant was excused from liability for direct

infringement of the public performance right because its transmission of

television programs to subscribers was automated. *See Aereo*, 134 S. Ct. at

2507. Many other courts in many other contexts have also made clear that

defendants can be directly liable for copyright infringement when they use

software to implement their decisions to infringe copyrighted content. For

instance, in *Perfect 10, Inc. v. Amazon.com, Inc.*, this Court held that the

plaintiff had made a prima facie case that the defendant had directly

infringed the display right where the defendant's "computers . . . initiate[d] and control[led] the storage and communication" of the plaintiff's images. 508 F.3d 1146, 1160 & n.6 (9th Cir. 2007) (emphasis added). Similarly, in *Arista II*, the district court held that the defendants' direct infringement of the distribution right included using automation to implement decisions regarding "which newsgroups their servers accept and store and which they reject." 633 F. Supp. 2d at 148-49.

Likewise, in *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013), the court held that the defendant was directly liable for infringement of the reproduction right where it had used a software program to locate and upload copyrighted iTunes songs on customers' computers. The court explained that "[w]hile that process is itself automated, absolving [defendant] of direct liability on that ground alone would be a distinction without a difference." *Id.* at 645-46, 657; *see also Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 549, 552 (N.D. Tex. 1997) (finding direct infringement of the reproduction right where the defendants' "steps included using . . . software to troll the Usenet" for plaintiff's content); *Quantum Sys.*, 338 F. App'x at 336 ("The fact that Sprint's computers generated copies and loaded these copies into RAM automatically does not absolve Sprint of

19

liability for copyright infringement."); 2 Goldstein, *supra*, p. 18, § 7.0.2 ("[T]he economic injury to the copyright owner is the same, whether inflicted by man or machine; the fact that an algorithm was the culprit offers neither solace to the copyright owner nor incentives to the continued creation of literary and artistic works.").

This Court should clarify that automation is not a defense to direct copyright infringement.

### C. A "Volition" Test Could Not Logically Be Applied to Infringement of the Distribution Right

The district court also erred in its rejection of the plaintiff's distribution claim, on the ground that the defendants' distribution of the plaintiff's images to customers "does not state a claim because this distribution happens automatically, so Giganews has not engaged in volitional conduct by which it 'causes' the distribution." *Giganews*, 2013 WL 3610706, at *3. In addition to the reasons stated above, this ruling was erroneous because a "volitional conduct" standard cannot be squared with the law of direct infringement of the distribution right.[6]

---

[6] In *Cablevision*, the Second Circuit limited its volitional conduct holding to the 17 U.S.C. § 106(1) reproduction right, and noted that the test might not apply to infringement of different Section 106 rights. *See* 536 F.3d at 134.

17 U.S.C. § 106(3) grants owners of a copyrighted work the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." Distribution to the public is quintessentially an act in which a defendant's conduct cannot appropriately be distinguished on the basis of whether it is "volitional," and a defendant's liability cannot depend on whether a third party engages in a "volitional act" later in the distribution process.

This is so for at least two reasons. First, the text and legislative history of the distribution right in the Copyright Act make clear that a defendant engages in distribution of a work when it "makes available" the work for sale or other transfer, even if a copy of the work is never delivered. *See, e.g.*, *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013); 17 U.S.C. § 506(a)(1)(C) (expressly incorporating "making . . . available" standard); 4 Nimmer, *supra* p. 17, § 8:11[B][4][d] (collecting authority; "No consummated act of actual distribution need be demonstrated in order to implicate the copyright owner's distribution right."). For example, when a bookseller has displayed, or allowed others to display, books for sale to the public, the bookseller is engaging in distribution of all the books, even if some

of the books are never purchased. *See* 4 Nimmer, *supra*, p. 17 § 8:11[B][4][d].

Second, even where a defendant's delivery is consummated by a purchaser or borrower's receipt of a copy after a work has been made available, the defendant often is not the so-called "volitional" actor who causes the particular transfer to take place. Online, for instance, a delivery often is consummated only when a user takes the step to select a file made available on a defendant's computer. Imposing a volitional conduct requirement in such circumstances would be irreconcilable with the very nature of the distribution right, which by definition involves conduct, like sales or rentals to the public, *see* § 106(3), that necessarily often relies on the later acts of third parties to consummate the delivery.

Accordingly, the notion of "volitional conduct" has no place in determining whether the § 106(3) distribution right has been infringed.

## III. The District Court Misstated the Test for Intentional Inducement of Copyright Infringement

The district court misstated and misapplied the test for intentional inducement of copyright infringement, and thus rejected the plaintiff's claim under the wrong legal standard and without considering any of the plaintiff's evidence of defendants' intentional inducement.

22

Following the Supreme Court's decision in *Grokster*, 545 U.S. at 936-37, this Court has identified two different causes of action for contributory copyright infringement: intentional inducement and material contribution. *See Amazon.com*, 508 F.3d at 1171-72. "Despite the analytical similarities between the inducement and material contribution theories, it is now established in this Circuit that inducement and material contribution are <u>distinct</u> theories of contributory liability through which defendants can be found liable." *Fung*, 2009 WL 6355911, at *7 (C.D. Cal. Dec. 21, 2009) (emphasis added), *aff'd in relevant part*, 710 F.3d 1020 (9th Cir. 2013).

A defendant is liable for intentional inducement when it (1) provides a device, product, or service; (2) with the object or intent of promoting its use to infringe copyright; and (3) the device, product, or service causes (4) acts of infringement by another. *Fung*, 710 F.3d at 1032, 1033. There is no fifth requirement that the defendant also have actual knowledge of specific infringing activity caused by its device, product, or service. On the other hand, a defendant is liable for material contribution when (1) <u>with knowledge of infringing activity</u>, it (2) induces, causes, or materially contributes to the infringing conduct of another. *See Napster*, 239 F.3d at 1019. The district court in *Fung* emphasized that the material contribution test's knowledge

23

requirement is "in contrast" to the inducement test's intent requirement. 2009 WL 6355911, at *7.

The district court erred by failing to treat the two causes of action as distinct. Instead, it held that knowledge was a required first element of both tests. *See Giganews*, 2014 WL 8628031, at *6-7 (citing *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007)). Based on this mistaken view, the district court never considered defendants' liability under the four-part inducement test, and instead denied the plaintiff's inducement claim solely on the ground that "there is no evidence that Giganews had any <u>actual knowledge</u> of any <u>specific infringing materials</u> that it did not immediately block access to." *Id.* at *11 (emphasis added).

The district court's legal analysis is wrong. In stating the test for intentional inducement of copyright infringement, the Supreme Court in *Grokster* made clear that while a defendant's <u>intent</u> to encourage infringement generally is a required element of inducement liability, there is no requirement that the defendant be aware of any specific infringements that its product caused. Indeed, the Court expressly rejected – as "error" – the view that an Internet service operator's secondary liability must be premised on the defendant's "'specific knowledge of infringement at a time at

24

which they contributed to the infringement.'" *Grokster*, 545 U.S. at 933-94 (quoting *MGM Studios Inc. v. Grokster, Ltd.*, 380 F.3d 1154, 1162 (9th Cir. 2004)).

The case that the district court cited for a specific-knowledge requirement for intentional inducement liability, *Visa*, simply does not say that. Affirming a Rule 12(b)(6) dismissal, this Court in *Visa* held that the plaintiff had failed to adequately plead contributory infringement under either the inducement or material contribution theory. *See Visa*, 494 F.3d at 795. In dictum, the Court observed that the several criteria of each test were "non-contradictory variations on the same basic test," but acknowledged that the two tests were distinct. *Id.*

Thus, the *Visa* Court did not state or imply that intentional inducement requires evidence of a defendant's "actual knowledge of any specific infringing materials that it did not immediately block access to." *Giganews*, 2014 WL 8628031, at *11. And if there could be any doubt on this score, this Court dispelled it in the later-decided *Fung* case. In a thorough discussion of the elements and legal basis of the intentional inducement cause of action, this Court held that, regardless of a defendant's knowledge of specific acts of infringement, "if one provides a service that could be used to infringe

25

copyrights, with the manifested intent that the service actually be used in that manner, that person is liable for the infringement that occurs through the use of the service." *Fung*, 710 F.3d at 1037; *see id.* at 1032 (noting that in *Grokster* "there was no evidence regarding timely knowledge of specific acts of infringement").

This Court should reverse the district court's ruling and require the district court to consider the plaintiff's evidence of the defendants' intentional inducement of copyright infringement.

## IV. The District Court Misapplied the Test for Contributory Copyright Infringement by Material Contribution

The district court also misapplied the test for contributory infringement by material contribution. Citing an inapplicable provision of the DMCA, the court erroneously declined to consider evidence of the defendants' actual knowledge of specific infringing activity. *See Giganews*, 2014 WL 8628031, at *8-9.

This Court has held that a plaintiff suing a provider of Internet services may establish the provider's culpable knowledge under the first element of the material contribution test as follows: "'[I]f a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and

26

contributes to direct infringement.'" *Amazon.com*, 508 F.3d at 1171 (quoting

*Napster*, 239 F.3d at 1011-13, 1019-22).

The plaintiff presented just such information to the defendants here,

providing voluminous notices that detailed thousands of examples of

infringements of the plaintiff's copyrighted works on newsgroups made

available on defendants' servers. *See Giganews*, 2014 WL 8628031, at *9.

However, the district court categorically refused to consider this evidence.

The court held that the plaintiff's notices failed to substantially comply with

all the requirements of the DMCA 17 U.S.C. § 512(c) safe harbor and

therefore could "'not be considered . . . in determining whether a service

provider has actual knowledge or is aware of facts or circumstances from

which infringing activity is apparent.'" *Giganews*, 2014 WL 8628031, at *8

(quoting 17 U.S.C. § 512(c)(3)(B)(i)).[7]

This ruling was erroneous because the cited statutory provision by its

terms applies only to a defendant's eligibility for a DMCA safe harbor. *See*

---

[7] The district court held that the plaintiff's notices were provided in a way
that made it purportedly cumbersome for the defendants to use the notices
to remove infringing files, *see Giganews*, 2014 WL 8628031, at *8-9, and thus,
in the court's view, failed to comply with the requirement that DMCA notices
provide "'information reasonably sufficient to permit the service provider to
locate the material.'" *Id.* at *8 (quoting 17 U.S.C. § 512(c)(3)(A)(iii)).

27

17 U.S.C. § 512(c)(3)(B)(i)) (providing that non-compliant notices "shall not be considered under paragraph (1)(A)," the DMCA safe harbor for information storage services) (emphasis added).  The defendants here, however, did not move for summary judgment on any DMCA safe harbor defense.

As this Court has emphasized, the DMCA merely provides an affirmative defense to a qualifying Internet service provider.  "[T]he DMCA does not change copyright law," *Amazon.com*, 508 F.3d at 1158 n.4, and "[f]ar short of adopting enhanced or wholly new standards to evaluate claims of copyright infringement against online service providers, Congress provided that [the DMCA's] 'limitations of liability apply if the provider is found to be liable under existing principles of law.'"  *Ellison v. Robertson*, 357 F.3d 1072, 1077 (9th Cir. 2004) (emphasis in original).

The DMCA safe harbor provisions therefore cannot be applied here to limit the "existing principle[]" of contributory infringement law: information in any form that provides a defendant with actual knowledge of specific infringing activity must be considered by a court.[8]  Accordingly, this Court

---

[8] As support, the district court cited *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072-73 (9th Cir. 2013); *see Giganews*, 2014 WL 8628031, at

should reverse the district court's ruling and instruct the district court to evaluate the plaintiff's evidence of the defendants' actual knowledge of infringing activity on their service.

## V. The District Court Misconstrued the Financial-Benefit Element of the Test for Vicarious Copyright Infringement

A defendant infringes vicariously by (1) failing to exercise a right or ability to stop or limit the direct copyright infringement of others, while (2) enjoying a financial benefit from the infringing activity. *See Grokster*, 545 U.S. at 930; *Visa*, 494 F.3d at 788.

It is well established that the financial benefit element is satisfied by showing that "the availability of infringing material 'acts as a "draw" for customers,'" *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th

---

*8. But in *Luvdarts* this Court merely observed that the plaintiff's infringement notices would not have satisfied the DMCA. *Luvdarts*' holding was that the plaintiff's notices failed to create evidence of defendants' knowledge of specific infringing activity, not because the notices were DMCA non-compliant but because they merely listed titles of copyrighted works that the plaintiffs owned, failing to "identify which of these titles were infringed, who infringed them, or when the infringement occurred." 710 F.3d at 1073. Such notices failed to establish culpable knowledge because they were "indistinguishable from a generalized notification that infringement is occurring." *Id.* at 1072-73. The district court here did not make such a finding about the notices in this case.

Cir. 2001) (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996)), "regardless of how substantial the benefit is in proportion to a defendant's overall profits," *Ellison*, 357 F.3d at 1079 (emphasis omitted).

Here, the plaintiff presented evidence that defendants' business is devoted to promoting and benefiting from massive copyright infringement; their service is "awash in copyrighted material," including, "staggering amounts of copyrighted works owned by move producers and television networks," *Giganews*, 2014 WL 8628031, at *4; and they charge users as much as $34.99 a month for no reason other than the ability to acquire unauthorized access to this copyrighted material. That evidence should have readily satisfied the financial benefit element.

The district court rejected this evidence. Citing no legal authority, the court held that the plaintiff also had to show "that at least some of Giganews' customers were 'drawn' to Giganews' services, in part, to obtain access to infringing Perfect 10 material" or at least "the broader category of erotic images." *Giganews*, 2014 WL 8628031, at *4 (emphasis in original).[9]

---

[9] Having granted summary judgment on the financial benefit element, the district court declined to address the supervision or control element. *See*

The district court's addition of an extra element to the financial benefit test is contrary to law and policy. For decades, courts have consistently premised vicarious liability on a defendant being in the best position to stop or limit copyright infringement generally based on their right or ability to supervise or control it, and having the duty to do so because of the financial benefit they received from infringement. *See, e.g.*, *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 306, 308-09 (2d Cir. 1963) (defendant department store operator had the ability to supervise "the conduct of its [bootleg record] concessionaire . . . ; our judgment will simply encourage it to do so, thus placing responsibility where it can and should be effectively exercised").

In fact, there has never been an additional requirement that the financial benefit from infringement be parsed on a work-by-work or plaintiff-by-plaintiff basis. That is not the purpose of vicariously liability. Rather,

> [w]hen an individual seeks to profit from an enterprise in which identifiable types of losses are expected to occur, it is ordinarily fair and reasonable to place responsibility for

---

*Giganews*, 2014 WL 8628031, at *6. Since the defendants had pervasive control over their own servers, chose what content to copy, and could grant or deny server access, *see Giganews*, 2014 WL 8628034, at *3, the plaintiff easily would have satisfied this element.

31

> those losses on the person who profits . . . .   The enterprise
> and the person profiting from it are better able than either
> the innocent injured plaintiff or the person whose act
> caused the loss to distribute the costs and to shift them to
> others who have profited from the enterprise.

*Polygram Int'l Publ'g., Inc. v. Nevada/TIG, Inc.*, 855 F. Supp. 1314, 1325 (D.

Mass. 1994).

Thus, in *Polygram*, the court noted that in the earliest vicarious

infringement cases, "courts determined that profit could be inferred from the

very fact of playing music in a profit-making establishment." *Id.* at 1330

(emphasis omitted).  The court found that a defendant computer trade show

had benefited financially because music enhanced the attractiveness of the

show and some of the defendant's exhibitors "performed music, some of it

copyrighted, to attract attention to their booths." *Id.* at 1333.  The

requirement for liability was only that music in general was the draw, not the

specific copyrighted works of any of the fifteen separate plaintiffs in the case.

Likewise, this Court and courts within the Ninth Circuit have

determined that a defendant's draw from infringement generally is sufficient

to establish liability, without requiring a draw particularized to the works of

individual plaintiffs or a specific category of works.  For instance, in *Napster*,

this Court affirmed a finding of likely vicarious infringement based on the

benefit accruing to Napster "as the quality and quantity of available <u>music</u>
increases." 239 F.3d at 1023 (emphasis added; quotation omitted). This
Court thus affirmed an injunction in favor of a group of plaintiffs that
included individual songwriters without any determination that those
individuals' compositions had themselves been a draw. Similarly, in *Ellison*,
where an individual author sued AOL for infringement of his books, this
Court did not limit its consideration to the draw to AOL from the plaintiff's
books, or even books as a category, but instead examined the draw for AOL
from "the infringing activity taking place on [AOL's] USENET servers."
*Ellison*, 357 F.3d at 1079. *See also, e.g.*, *Fonovisa*, 76 F.3d at 263-64
(considering the draw of "the sale of pirated recordings" rather than the
draw of infringements of plaintiff's own recordings).

 As one court put it, "Defendants cannot deny that they expected
financial benefit from the entertainment made available at their
establishment. Defendants cannot avoid responsibility by requiring a
specific showing of profits derived from the performances at issue." *BMI v.
Blumonday, Inc.*, 1994 WL 259253, at *2 (D. Nev. May 27, 1994).

 The district court's ruling here also flies in the face of the policy behind
vicarious liability. Under the district court's rationale, a defendant that

33

profits from massive copyright infringement and could act to stop or limit the infringement would have the duty to do so as to only some of the victims of its infringing business. In particular, smaller copyright owners could be left without an effective remedy based on the difficulty of showing that users who were paying up to $35 a month for all the unauthorized music, movies, software, and images they could download were drawn specifically to one copyright owner's works.

Neither law nor logic supports the district court's financial benefit ruling; it should be reversed.

## CONCLUSION

For the reasons stated above, the district court's direct infringement, vicarious infringement, inducement of infringement, and contributory infringement rulings should be reversed.

Dated: December 23, 2015      Respectfully submitted,

/s/ Thomas G. Hentoff
Thomas G. Hentoff
Nicholas G. Gamse
  Williams & Connolly LLP
  725 Twelfth Street, N.W.
  Washington, DC 20005
  (202) 434-5000
  thentoff@wc.com

George M. Borkowski
 Recording Industry Association of
  America, Inc.
 1025 F Street, N.W.
 Washington, DC 20005
 (202) 775-0101
 gborkowski@riaa.com

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT <u>AND TYPE STYLE REQUIREMENTS</u>

I hereby certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Century Expanded BT 14-point font.

Dated: December 23, 2015

<u>/s/ Thomas G. Hentoff</u>
Thomas G. Hentoff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused to be filed electronically the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellant CM/ECF system on December 23, 2015. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 23, 2015

/s/ Thomas G. Hentoff
Thomas G. Hentoff